UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>ALFIO J. RAGONESE<br><br>              Debtor<br><br>RICHARD FALCONE AND MARY FALCONE<br><br>              Plaintiffs<br><br>v.<br><br>ALFIO J. RAGONESE<br><br>              Defendant | Chapter 7<br>Case No. 11-42867   -MSH<br><br><br><br><br><br>Adversary Proceeding<br>No. 11-4138 |

**MEMORANDUM OF DECISION**

In this adversary proceeding, Richard and Mary Falcone, former customers of Alfio Ragonese's company, seek a determination that Mr. Ragonese fraudulently induced them to pay money to his company and that his liability arising therefrom should be excluded from his bankruptcy discharge. After having heard and considered the testimony and demeanor of the witnesses at trial and having reviewed the exhibits admitted in evidence and the pleadings submitted by the parties, I will enter judgment on the Falcones' complaint that the payment made by the Falcones on or about November 30, 2007, which the parties agree was in the amount of $100,000, is a debt that is excepted from Mr. Ragonese's bankruptcy discharge. This is a core

1

matter over which I have jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(J) and (O). My findings of fact and rulings of law follow.

In January 2007 plaintiff, Mary Falcone, using the pseudonym, Olivia Pritchard, posted an internet solicitation for bids to construct a lakeside home in Wakefield, New Hampshire. Defendant, Alfio Ragonese, responded to the solicitation. In the spring of 2007, after a series of discussions, meetings and exchanges of documents, Mary and her husband, co-plaintiff, Richard Falcone, agreed to engage Mr. Ragonese for the project. Mr. Ragonese did business through a corporation known as RACO Construction Corp. or RACO Development Corp. In March and June of 2007 the Falcones paid RACO a total of $60,000 to demolish the old house on their property in Wakefield and to prepare the lot for construction of their new home. Around that time the Falcones gave Mr. Ragonese a set of architectural plans for their new home prepared by the Reitmann Design Group.

On or about June 15, 2007, Mr. Ragonese on behalf of RACO presented the Falcones with a five page document on RACO Construction Corporation letterhead which appeared to be a contract for the project. I will generally refer to this document throughout this memorandum as the "June 2007 construction summary." The June 2007 construction summary was amateurishly drafted in a conversational tone with numerous typographical and grammatical errors rather than in a form typically associated with construction contracts, or any contract for that matter, such as by use of a standard American Institute of Architects form. For example, in describing windows for the home to be constructed the document states:

> "All windows will be Harvey Windows. I am sure you have recognized their name on TV a (sic) one of the largest manufacturers of windows and exterior doors. Their product is clearly high quality as I have always used them and have never had any complaints or problems."

2

The document appeared to call for the demolition of the existing structure on the Falcones' property, raising the grade of the property by 3 feet and constructing a new home using the Retimann plans for a price of $615,000. After making handwritten changes to the June 2007 construction summary including adding $20,000 in additional items and striking out the paragraph requiring change orders to be in writing, on July 30, 2007, Mr. Falcone signed it. The June 2007 construction summary in either its original or modified form was never signed by Mrs. Falcone, RACO or Mr. Ragonese. Despite the absence of a signed contract, on or about July 26, 2007, the Falcones paid RACO $100,000 for project costs.

The project did not proceed smoothly. Initially, the building inspector for the Town of Wakefield refused to issue a building permit because the architectural plans were inadequate. This resulted in Mr. Ragonese's bringing in Dan Gelinas, a structural engineer, to supplement or revise the Reitmann plans. The Falcones and RACO's foreman for the Falcones' project, Kevin Knowles, also met with Mr. Gelinas to make changes to the project. These changes added to the cost of construction. Like the June 2007 construction summary, however, these changes were not memorialized in a writing signed by the parties and so as the project progressed there was confusion as to exactly what changes from the original unsigned contract were made and who would bear the cost of those changes. As summer turned to fall, there was little visible progress at the building site. In September, 2007, Mr. Ragonese asked the Falcones for additional money to continue construction. Mr. Falcone responded "I've already paid you $160,000" which elicited a lecture by Mr. Ragonese on the intricacies of house building in New Hampshire. Mr. Falcone told Mr. Ragonese that the house needed to be framed and made weather tight and the septic system installed prior to the onset of winter. Mr. Ragonese responded that he needed money in

3

order to do this. On or about September 6, 2007, the Falcones paid RACO another $100,000.

On September 23, 2007, Mr. Ragonese called Mr. Falcone, who was in Texas, requesting a payment of $75,000. After a discussion about why Mr. Ragonese needed the money and Mr. Ragonese's telling Mr. Falcone that he needed the money to continue work on the house, Mr. Falcone made the payment to RACO on or about September 25, 2007. Construction of the house continued through September and October.

On November 2, 2007, Mr. Ragonese called Mr. Falcone and said he needed another $100,000 for work outside and inside the house. The house had still not been rendered weather tight. On or about November 9, 2007, the Falcones paid RACO another $100,000. By this point they had paid RACO a total of $435,000.

Up to that time there had never been a formal construction progress schedule, written or verbal, for the Falcones' project. At no time did the parties ever articulate, in writing or otherwise, a schedule or methodology for determining when the Falcones would be required to make progress payments to RACO for the construction project or how much those progress payments would be.

In mid-November, Mr. Ragonese asked Mr. Falcone for more money. At this point Mr. Falcone, who had become increasingly concerned about Mr. Ragonese's lack of progress on the job, for the first time asked Mr. Ragonese for a construction schedule. On November 18, 2007, Mr. Ragonese emailed to Mr. Falcone an "estimated" construction schedule for the period from November 19 through December 10, 2007. The schedule included exterior work on siding, septic and underground utilities and interior work on rough electrical, HVAC and rough plumbing. In the email Mr. Ragonese stated that starting on November 19, 2007, "I will be exclusively on this

4

project." He also asked Mr. Falcone for $125,000 plus $55,000 for certain extras that Mr. Falcone had requested. The three week work schedule presented by Mr. Ragonese suggested that significant work would remain to be done after completion of the items on the schedule, including finish plumbing and electrical, cabinetry, trim and interior finishes.

Also, in mid-November, the Falcones received a written demand from Ossipee Aggregate Corp., one of RACO's subcontractors or suppliers, for payment of $31,000 for goods or services supplied to their property. Mr. Falcone expressed to Mr. Ragonese his concern that RACO and Mr. Ragonese were not devoting the money the Falcones were paying them exclusively to their project and their fear that Ossipee Aggregate would place a lien on their property.

In a lengthy email dated November 24, 2007, from Mr. Ragonese to Mr. Falcone, Mr. Ragonese attempted to justify the project delays as not within his control, again asking for more money and telling Mr. Falcone that "all your monies are going on your project." In a lengthy email dated November 27, 2007, Mrs. Ragonese, who handled bookkeeping and support duties for RACO, assured the Falcones that "your house will NOT HAVE ANY LIENS ON IT."

On or about November 30, 2007, the Falcones paid RACO another $100,000 bringing the total paid for the project to $535,000.

On December 19, 2007, Mr. Ragonese sent the Falcones an email updating the status of work on the project and asking for more money. According to the email, siding, HVAC, interior electric and plumbing were still not complete.

On or about January 4, 2008, Mr. Falcone paid RACO $28,000. This payment related to certain extra work that the Falcones had requested be added to the project. The evidence is unclear whether this $28,000 incorporates the $20,000 added by Mr. Falcone to the original June,

5

2007 construction summary or is in addition to that sum. There is no dispute, however, that the payment was for extra work not contemplated in the original draft of the June 2007 construction summary.

On January 26, 2008, Mr. and Mrs. Ragonese and Mr. and Mrs. Falcone met at the jobsite, toured the property and discussed what work remained to be done. A few days after this meeting Mr. Ragonese emailed to the Falcones a two page summary dated January 22, 2008, containing 18 items of extras to the project that Mr. Ragonese claimed were not within the scope of the project as described in the June 2007 construction summary. The cost of these extras according to Mr. Ragonese was $99,700.

At the end of January 2008, the Falcones and the Ragoneses participated in a conference call. Mr. Falcone informed the Ragoneses that progress on the project was inadequate based on the amount of money that had been paid to RACO and Mr. Ragonese to date and that no more payments would be made until the project was further along. Mr. Ragonese disagreed with Mr. Falcone's premise that the project's status and the funds paid were out of balance pointing to the extras set forth in his January 22, 2008 summary. Mr. Ragonese told the Falcones that he would not continue the project without additional payment.

The parties were at loggerheads. The project came to a dead stop. Mr. Ragonese and RACO never worked on it again. At trial Mr. Falcone and the Wakefield building inspector, Arthur Capello, testified that when work was halted in January, 2008, the project was 50% complete. Mr. Ragonese testified that it was 75% complete. In either case, a considerable amount of work was needed to finish the project. The Falcones ultimately engaged another builder to complete construction of their home at an additional cost of more than $390,000.

Mr. Ragonese filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this court on June 30, 2011. The Falcones initiated this adversary proceeding against Mr. Ragonese by filing a three count complaint seeking to exclude from discharge pursuant to Bankruptcy Code § 523(a)(2)(A) and § 523(a)(4) Mr. Ragonese's debts to them and seeking a declaratory judgment that under veil-piercing theories the debts of RACO to the Falcones should be deemed the debts of Mr. Ragonese personally.

On the day of trial the Falcones dropped count II of their complaint (non-dischargeability under § 523(a)(4)) and count III (veil-piercing) leaving only count I (non-dischargeability under § 523(a)(2)(A)) to be tried.

Looming over this entire proceeding like the proverbial elephant in the room is RACO. All the money paid by the Falcones for their home building project was paid to RACO. The unsigned June 2007 construction summary was with RACO. Yet the debtor in the main case and the defendant here is Mr. Ragonese, and § 523 applies only to debts of Mr. Ragonese. The Falcones' complaint reflects their awareness of this technicality and their solution is count III where they seek to pierce the corporate veil in order to have Mr. Ragonese held to be personally responsible for the debts of RACO. The Falcones dropped this count of their complaint, however. At trial they articulated the position that if they could prove that Mr. Ragonese fraudulently induced them to pay money to RACO he would become personally liable to them for the sums paid. This is an accurate summary of applicable law and I will adopt it. To quote the Restatement of Torts (Second) § 531:

> One who makes a fraudulent misrepresentation is subject to liability to the persons…whom he intends or has reason to expect to act or to refrain from acting in reliance upon the misrepresentation, for pecuniary loss suffered by them through their

7

justifiable reliance…[1]

*See also LaClair v. Silberline Mfg. Co.*, 379 Mass. 21, 29, 393 N.E.2d 867, 872 (1979) (" A corporate officer is liable for torts in which he personally participated whether or not he was acting within the scope of his authority.");[2]*Marshall v. Stratus Pharmaceuticals, Inc*., 51 Mass. App. Ct. 667, 677, 749 N.E.2d 698, 708 (2001) ("Although acting within their authority as officers of Stratus, Hoyo and Pyle are 'personally liable for their own misrepresentations made to [the plaintiff] in violation of G.L. c. 93A, § 11, even though they did not sign the agreement' in their individual capacities. *Standard Register Co. v. Bolton-Emerson, Inc.,* 38 Mass. App. Ct. 545, 550-551, 649 N.E.2d 791 (1995), and cases cited. *The Community Builders, Inc. v. Indian Motocycle Assocs., Inc.,* 44 Mass. App. Ct. 537, 560, 692 N.E.2d 964 (1998) (settled that corporate officers may be held liable under c. 93A for their personal participation in conduct invoking its sanctions").

    Mr. Ragonese did not oppose the Falcones recasting their claim from a veil-piercing cause of action to one for fraudulent inducement and prosecuting that claim at trial. Therefore, pursuant to Rule 7015(b)(2) of the Federal Rules of Bankruptcy Procedure I will treat the Falcones' claim for fraudulent inducement in all respects as if it had been raised in the pleadings and proceed to rule on the merits and the non-dischargeability of their claim.

    In order to establish that a debt is non-dischargeable under § 523(a)(2)(A) as having

---

[1]The Massachusetts Appeals Court cited § 531 with approval in *Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 787 N.E.2d 1060 (2003), in which it held that plaintiffs, who were shareholders of a corporation, met their burden when they showed they were among people whom the accounting firm had reason to know would rely upon misstatements in the corporation's audited financial statements.

[2] In his answer Mr. Ragonese admitted he is the sole officer and director of RACO.

8

been obtained by false pretenses, false representations or actual fraud, a creditor must show that:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, (2) the debtor intended to deceive, (3) the debtor intended to induce the creditor to rely upon the false statement, (4) the creditor actually relied upon the misrepresentation, (5) the creditor's reliance was justifiable, and (6) the reliance upon the false statement caused damage.

*McCory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (internal footnote omitted).

Based on the legal principles just summarized, the most efficient way to evaluate the validity of the Falcones' claim is to examine each of the payments made in reliance upon Mr. Ragonese's alleged fraudulent conduct.[3]

The first two payments totaling $60,000 made in the spring of 2007 were for demolition work and site preparation. No evidence was presented at trial to establish that Mr. Ragonese fraudulently induced the Falcones to make these payments. On the contrary, the testimony of Mr. Falcone was that he and Mrs. Falcone received monies worth for these payments.

The third payment, of $100,000, was made in July 2007 and coincided with Mr. Falcone's executing the June 2007 construction summary which was never executed by RACO or Mr. Ragonese. No evidence was presented to support a finding that in June and July of 2007 Mr. Ragonese made false or recklessly or deceptively untruthful representations to the Falcones about the construction project. The same holds true for the $100,000 payment in early September, 2007, the $75,000 payment in late September, 2007, and the $100,000 payment in early November, 2007.

The evidence establishes that the Falcones wanted their house framed and made weather

---

[3] As the Court of Appeals for the First Circuit noted, a misrepresentation that can be the basis for denial of a discharge of a debt is more not just a misrepresentation made to induce a party into entering a contract. "Transaction ... is a broader term than 'contract.'" *Black's Law Dictionary* 1496 (6th ed. 1990)." *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 69 (1st Cir. 2012)

tight by winter and Mr. Ragonese told them RACO needed these payments to achieve their objective. While it is true that Mr. Ragonese fell short of achieving their goal, the evidence at trial does not establish that he acted fraudulently or made false or recklessly or deceptively untruthful statements up to this time. At best the evidence establishes that Mr. Ragonese was involved in multiple construction or development projects during the relevant time period and he failed to devote sufficient attention to the Falcone's project. The evidence is also clear that Mr. Ragonese caused RACO to commingle in a single bank account the payments from the Falcones with all the other incoming payments on its projects thereby resulting in payments to RACO's subcontractors and suppliers from commingled funds. Mr. Ragonese also failed to delineate with precision the scope of the Falcone's project, especially the various changes and additions that arose during the course of construction. In short, Mr. Ragonese and RACO were sloppy and unprofessional. Why the Falcones were willing to fork over hundreds of thousands of dollars to RACO on this basis is a mystery. They may have thought their money was being segregated and devoted exclusively to their project and that Mr. Ragonese was working full time on their project but the evidence establishes that these assumptions were unfounded and unreasonable. The Falcones had it within their power to avoid all this. They could have obtained Mr. Ragonese's commitment to keep all payments from their project separate from all other projects. They could have established a detailed construction timetable calling for progress payments only upon Mr. Ragonese's meeting articulated benchmarks. While the Falcones have suggested that Mr. Ragonese should have done these things the evidence does not support a finding that he agreed to do any of them, at least up to early November, 2007.

By mid-November, 2007, however, the evidence establishes that the situation changed.

The demand for payment by Ossipee Aggregate, Mr. Ragonese's insatiable appetite for additional money and the deteriorating weather while the house continued to be exposed to the elements, caused the Falcones to be concerned as to RACO's and Mr. Ragonese's dedication to their project and whether RACO was spending money from the Falcones for expenses unrelated to the Falcone's project. The Falcone's had paid RACO $435,000 up to this point and the evidence establishes that they would not release any more funds without their concerns being satisfied.

In a November 24, 2007 email Mr. Ragonese told the Falcones that "all your monies are going into the project." In a November 27, 2007 email Mrs. Ragonese assured them that the house "will NOT HAVE ANY LIENS ON IT." In a November 18, 2007 email Mr. Ragonese presented the Falcones with a three week construction schedule in which he promised to "be exclusively on this project." I find that it was based on these commitments that the Falcones paid RACO the additional $100,000 on November 30, 2007.

I find that Mr. Ragonese fraudulently induced the Falcones to pay RACO $100,000 on November 30th. The evidence at trial establishes that all the Falcones' payments to RACO were deposited into a Citizens Bank checking account of RACO which account was used to pay expenses of RACO including expenses unrelated to the Falcones' project. Prior to November 24, 2007, any expectations the Falcones harbored that their payments were being kept separate by Mr. Ragonese for use only on their project were unreasonable. There is no evidence of an agreement to this effect. However, in his November 24, 2007, email Mr. Ragonese did agree to devote all money paid by the Falcones to their project. I find that Mr. Ragonese's representation was untrue and he knew it to be untrue when he made it. As was the case with all their other

11

payments, Mr. Ragonese commingled the Falcones' November 30, 2007, payment of $100,000 with other funds in RACO's checking account. Mrs. Ragonese testified that she paid the bills for a number of projects from RACO's checking account and that she reviewed all invoices with Mr. Ragonese prior to payment.

Mr. Ragonese also falsely represented to the Falcones in his email of November 18, 2007, that as of November 19, 2007, he would work exclusively on their project. Dana Johnson, a carpenter who worked on the Falcones' project between September 2007 and January 2008, testified that Mr. Ragonese was not at the project on a daily basis and that he would see Mr. Ragonese a couple of time per week. I find that Mr. Ragonese knew that his promise to be exclusively on the Falcone's project was false at the time he made it.

By his false statements Mr. Ragonese intended to induce the Falcones, who by mid-November 2007 were threatening to freeze payments, to make the additional $100,000 payment of November 30th. That the Falcones relied on Mr. Ragonese's promises is fully consistent with the testimony of Mr. Falcone, which I find credible and compelling.

Having established that Mr. Ragonese made knowingly false representations upon which the Falcones relied, the remaining hurdle which the Falcones must overcome in order to make out a case for both tortious misrepresentation and non-dischargeability under Bankruptcy Code § 523(a)(2)(A) is that their reliance was justifiable.

In *Field v. Mans*, 516 U.S. 59 (1995), the U.S. Supreme Court, in reversing the Court of Appeals for the First Circuit, held that in order to prevail on a non-dischargeability claim under Bankruptcy Code § 523(a)(2)(A) a creditor must prove reliance on the debtor's fraudulent or false representation and that such reliance must be justifiable but not necessarily reasonable. The

12

Supreme Court distinguished reasonable reliance which invokes exploration into the conduct of the hypothetical reasonable person of legal legend from the less stringent standard of justifiable reliance which looks only to the qualities and characteristics of the particular plaintiff and the circumstances of the particular case to determine if the recipient of the misrepresentation is capable of appreciating the falsity at the time by the use of his available faculties.

In this case, while the Falcones' reliance on Mr. Ragonese's false statements may not have been reasonable, I find that it was justified under the circumstances. Using all their senses, including their ability to observe, their common sense and the accumulated understanding of their relationship with Mr. Ragonese, the Falcones could not have uncovered the falsity of Mr. Ragonese's representations that he would devote all his time and all their money to the project. The Falcones reliance being justified for purposes of their non-dischargeability claim, it is also justified for purposes of their tortious misrepresentation claim.

The Falcones made one last payment to RACO of $28,000 in January, 2008. The evidence establishes that the nature and circumstances of this payment make it unlike the prior payments made by the Falcones. This payment was specifically earmarked by the Falcones for extra work and materials requested by them for which they felt responsible. The evidence does not suggest that this payment was induced by Mr. Ragonese through false promises and in any event by January 2008, with the project still far from complete, any reliance by the Falcones on anything Mr. Ragonese had promised would not have been justified.

Based on the foregoing, judgment shall enter for plaintiffs, Mr. and Mrs. Falcone, against defendant, Mr. Ragonese, that the payment made by the Falcones on or about November 30, 2007, which the parties agree was in the amount of $100,000, is a liability of Mr. Ragonese

13

which shall be excluded from discharge in Mr. Ragonese's bankruptcy pursuant to Bankruptcy Code § 523(a)(2)(A).

    A separate judgment shall issue.

Dated: July 8, 2013

By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

14